UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Tracey Quimby**

   **v.**                                              Civil No. 12-cv-428-PB
                                                      Opinion No. 2013 DNH 150
**Michael J. Astrue, Commissioner,**
**Social Security Administration**


### MEMORANDUM AND ORDER


Tracey Quimby seeks judicial review of a ruling by the
Commissioner of the Social Security Administration ("SSA")
denying her application for Disability Insurance Benefits
("DIB").  Quimby claims that the Administrative Law Judge
("ALJ") lacked substantial evidence to support his finding that
she was not disabled.  Quimby also claims that the ALJ failed to
properly evaluate the medical evidence, relied on his own lay
assessment of the medical record in formulating Quimby's non-
exertional limitations, and improperly rejected the opinions of
Quimby's treating physicians.  For the reasons set forth below,
I remand the case for further proceedings before the
Commissioner.

## I.  BACKGROUND[1]

### A.  Procedural History

Quimby applied for DIB on June 21, 2010, claiming that she had suffered from the following impairments since February 17, 2009: bipolar disorder; depressive disorder; generalized anxiety disorder; posttraumatic stress disorder; obsessive-compulsive disorder (OCD); attention deficit disorder (ADD); personality disorder; posttraumatic ankle and talo-navicular arthritis; and obesity.  The SSA denied Quimby's claim on August 3, 2010.  Quimby then requested a hearing before an ALJ, which was held on July 13, 2011.  A vocational expert ("VE") testified.

On August 26, 2011, the ALJ issued a decision finding that Quimby was not disabled on or after her alleged disability onset date.  The Appeals Council denied Quimby's request for review on September 26, 2012.  Accordingly, the ALJ's decision is the final decision of the Commissioner.[2]

---

[1] The background facts are presented in the parties' Joint Statement of Material Facts (Doc. No. 11) and are summarized here.  I also rely on the Administrative Transcript (Doc. No. 6), citations to which are indicated by "Tr."

[2] Quimby subsequently filed a new application for DIB.  The SSA granted this application on January 4, 2013, finding a disability onset date of August 27, 2011 - one day after the ALJ's unfavorable decision with respect to her first

B.    **Medical History**

Quimby alleges various medical impairments dating to when she was thirteen years old.[3] At that time, Quimby suffered a fracture-dislocation of her left ankle.  She reported having some foot and ankle pain following the injury.  Radiographic imaging revealed soft tissue swelling around the ankle in 2008. Tr. at 289.  In 2009, Quimby failed to mention any difficulty with her ankle to her primary care physician, Dr. Thomas Hong. The next year, Quimby informed Dr. Hong that she was experiencing worsening ankle pain, particularly when walking. Dr. Hong diagnosed a medial avulsion, talar spur, and moderate crepitus throughout the ankle's full range of motion.[4]  He assessed that Quimby was likely developing arthritis in the ankle, recommended analgesic medication along with a regimen of

_____

application.

[3] Quimby was thirty-three years old on February 17, 2009, her alleged disability onset date.

[4] A medial avulsion is a "tearing away or forcible separation" near the midline of the ankle.  Stedman's Medical Dictionary 189, 1167 (28th ed. 2006).  A talar spur is a "dull spine or projection" from the bone forming the ankle joint.  Id. at 287, 1816, 1933-34.  Crepitus is "the grating of a joint."  Id. at 457.

"icing, elevating and compressing," and referred Quimby to Dr. Christopher E. Gentchos, an orthopedist.  Tr. at 254, 339-40.

Quimby reported to Dr. Gentchos that she was experiencing a "dull, deep, aching sensation" in the ankle that responded negligibly to over-the-counter ankle wraps, but that she nevertheless enjoyed walking.  Dr. Gentchos noted swelling above the ankle, mild arthritic deterioration, "considerable exostosis at the talus distally at the talonavicular joint,"[5] but no noticeable instability, antalgia,[6] or abnormality in her gait.  He also noted that Quimby was five feet ten inches tall and weighed 275 pounds.[7]  Dr. Gentchos recommended a brace for the ankle, which Quimby began using in July 2010.  Quimby's orthotist, Philip R. Pincince, noted that "[t]he fit and function w[ere] good and she felt comfortable and supported in the brace."  Nevertheless, Dr. Gentchos cautioned that "progressive changes" in the ankle were likely regardless of medical intervention.

---

[5] This description refers to a "cartilage-capped bony projection" extending from the ankle joint away from the body.  Id. at 572, 683-84, 1282, 1934.

[6] Antalgia is a "response to painful stimuli".  Id. at 71, 99.

[7] Between June 2009 and July 2011, Quimby's weight fluctuated between 259 and 320 pounds.

4

In 2002, Quimby began attending counseling sessions two to three times per month with her psychologist, Dr. Anne Boedecker, to address a variety of mental impairments.  She also consulted with Dr. Hong, and psychiatric nurse practitioner Lois Hollow began prescribing psychiatric medication to Quimby in 2007.  In February 2009, Dr. Boedecker noted that Quimby was temporarily unable to work due to panic disorder, resulting in panic attacks, agitation, restlessness, and rapid speech.  She recommended flexible work hours once Quimby's medication was adjusted.  At that time, Dr. Hong observed that Quimby suffered from uncontrolled panic and anxiety.  After some progress in Quimby's ability to cope with anxiety, Dr. Boedecker noted in May 2009 that Quimby could return to working twenty to thirty hours per week in a job that did not require significant travel.

In August 2009, Quimby reported to Ms. Hollow that she was experiencing constant anxiety, irritability, mood swings, difficulty breathing, sweating, racing thoughts, and a desire to flee or hide.  Quimby reported some improvement in her level of anxiety and her emotional state in October 2009 after beginning a trial of Prozac,[8] but noted that her OCD symptoms and ability

---

[8] Prozac is prescribed for the treatment of major depressive

to function at home and work had not improved.  Dr. Boedecker
assessed Quimby's global level of functioning over the previous
three years as indicative of "flat affect and circumstantial
speech[ with] occasional panic attacks[, or] moderate difficulty
in social[ or] occupational . . . functioning (e.g., few
friends[ and] conflicts with peers or co-workers)."[9]

By December 2009, Quimby, Ms. Hollow, and Dr. Boedecker had
all noted improvement in Quimby's mood, OCD, and anxiety level.
Quimby's condition continued to improve over the following three
months and she reported that she was "enjoying work" in March
2010, although she reported at least one panic attack that
month.  In July 2010, Dr. Boedecker noted that Quimby's mental

disorder and panic disorder.  Physician's Desk Reference 1841
(58th ed. 2004).

[9] This is the narrative description of Quimby's Global Assessment
of Functioning (GAF) score, which fluctuated between 52 and 54
in the year prior to October 2009.  See Am. Psychiatric Ass'n,
Diagnostic and Statistical Manual of Mental Disorders 34 (4th
ed. text rev. 2000).  The SSA has remarked that the GAF Scale
"does not have a direct correlation to the severity requirements
in our mental disorders listings," Revised Medical Criteria for
Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed.
Reg. 50,746, 50,764-65 (Aug. 21, 2000), and the American
Psychiatric Association no longer recommends use of the GAF
Scale due to "its conceptual lack of clarity . . . and
questionable psychometrics in routine practice."  Am.
Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental
Disorders 16 (5th ed. 2013) [hereinafter DSM-V].

impairments presented varying levels of severity.  Dr. Boedecker
described her anxiety as severe.  She observed that her
hyperactivity, panic attacks, inattention, irritability, and
mood instability were moderate.  Finally, she rated Quimby's
impulsivity, OCD, and depressed mood as mild.  Dr. Boedecker
also noted that Quimby's ability to function at home and work
had worsened, despite improvements in anxiety, emotional
lability, and other symptoms stemming from OCD.  Quimby and Dr.
Boedecker both reported that Quimby experienced varying levels
of anxiety, irritability, frustration, anger, and energy over
the following six months.  In March 2011, Ms. Hollow reported
that Quimby's mood was irritable and hypomanic,[10] but her anxiety
had improved to the point that her Prozac dose could be
decreased.  Dr. Boedecker similarly reported improvement in
Quimby's mood and noted that she had started a new job.
Nonetheless, she reported two months later that Quimby's anger
and irritability had increased and that her Prozac dose had been
increased to its previous level.

---

[10] Hypomania involves an "abnormally and persistently elevated,
expansive, or irritable mood . . . [with] persistently increased
activity or energy . . . ." DSM-V, supra note 9, at 124.

In medical source statements submitted in April 2011, Dr. Hong, Dr. Boedecker, and Ms. Hollow all noted marked limitations in Quimby's ability to understand, remember, and carry out detailed instructions; maintain attention and concentration sufficient to perform work tasks throughout an eight hour work day; complete a normal work day and work week without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavior extremes; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public transportation.  Tr. at 330-35. Dr. Boedecker diagnosed Quimby with social anxiety disorder, agoraphobia and panic attacks, borderline personality traits, OCD, low stress tolerance, bipolar disorder, and extreme irritability, and Dr. Hong additionally noted that Quimby had continuously suffered from anxiety, bipolar disorder, and ADD since at least May 2007.  Ms. Hollow noted that Quimby suffered from poor stress tolerance, was easily confused and frustrated,

8

struggled with household chores due to lethargy and poor follow-through, and was unable to function in a work setting.

In a function report completed in July 2010, Quimby stated that, subject to certain limitations, she was able to go outside once or twice a day, feed her cats, play cards, prepare meals, wash dishes, do laundry, shop at grocery stores, and use a computer to communicate with friends and shop for clothes. Quimby noted that she had no difficulty managing her personal care needs.  On the other hand, she reported that she hid from social situations and experienced severe panic in large crowds, could often not leave the house alone, and sometimes had to leave a store before completing her purchases.  Quimby noted that she could only pay attention for ten to fifteen minutes at a time, had difficulty focusing when watching television or playing cards, needed reminders to take her medications, and took a long time to complete tasks, if she finished them at all. With respect to physical limitations, Quimby noted that she could only walk for fifteen minutes before having to rest for half an hour.

In August 2010, two state agency providers reviewed Quimby's records.  State agency physician Dr. Brian Strain

concluded that Quimby could occasionally lift/carry twenty
pounds, frequently lift/carry ten pounds, stand and/or walk for
six hours in an eight-hour work day, sit for about six hours in
an eight-hour work day, crouch frequently, and crawl
occasionally.  Dr. Strain also noted that Quimby's left ankle
injury limited her ability to push and pull with her left leg
and that Quimby should avoid exposure to extreme cold, wetness,
and hazards.  In a second review, state agency psychologist Dr.
Julie Jennings concluded that Quimby was "limited to simple,
unskilled, non-stressful work" based on moderate limitations in
her attention, concentration, ability to complete a normal work
day and work week, ability to work consistently without an
unreasonable number and length of rest periods, and ability to
work with or near coworkers, supervisors, and the general
public.  In contrast, Dr. Jennings noted that Quimby had no
significant limitations in her ability to sustain a schedule or
routine without supervision, maintain regular attendance, or
maintain socially appropriate behavior.

     In December 2011, after the ALJ's hearing and decision,
psychologist Dr. Darlene R. Gustavson performed a consultative
examination of Quimby.  Dr. Gustavson diagnosed Quimby with

bipolar I disorder, posttraumatic stress disorder, social
phobia, dissociative identity disorder, and personality
disorder.  She noted that these impairments cause Quimby to be
"unable to consistently remember detailed instructions . . .
[or] sustain attention and concentration to complete tasks."

**C.   Administrative Hearing – June 13, 2011**

 1. <u>Quimby's Testimony</u>

 In response to questions regarding unexplained entries in
Quimby's record that she had been "working at her friend's Park
Avenue" and "working 12 hrs. at Maryann's," Quimby testified
that she had not worked since at least February 17, 2009, and
that these entries were likely typos referring to visits she had
made to her friend's dog breeding business.  She further
testified that she had received unemployment benefits for more
than a year while interviewing for jobs during the alleged
disability period, noting that she "still wanted to try" despite
believing that she was disabled.

 Quimby attested that she used her ankle brace every day,
and that it "alleviate[d] the chance of twisting and . . .
snapping" but did not alleviate "shooting pains."  She reported
that she could typically stand for an hour before needing to

rest and elevate her leg for twenty minutes.  She forewent any pain medication out of concern that she would become addicted.

Quimby testified that ADD affected her memory and prevented her from finishing projects; that OCD caused her to excessively wash her hands and check that her car was locked; that she suffered daily panic attacks including fifteen major panic attacks over the previous six months; that bipolar disorder caused her to accumulate credit card debt and have angry, verbal and physical outbursts which alienated her friends; that her ability to concentrate was limited to a fifteen to twenty minute period; and that her anxiety was aggravated by interacting with the public.  Quimby also largely corroborated the information in her July 2010 function report relating to her functional abilities and limitations.

### 2.   Vocational Expert Testimony

The ALJ asked VE Cynthia J. Ward to testify to the vocational abilities of a hypothetical individual with the same age, education, and relevant work experience as Quimby.  The ALJ explained that this hypothetical individual could perform a range of light exertion work with several additional limitations, including a three to five minute break following

each thirty to forty-five minute period of work.  The VE
testified that this hypothetical individual would not be able to
complete any of Quimby's past relevant work, but would be
capable of performing the jobs of housekeeper, mail clerk, and
photocopy clerk, which exist in significant numbers in the
regional and national economies.  Tr. at 66-67.  When Quimby's
attorney asked whether a hypothetical individual who was unable
to work at a faster rate than average would "be unable to . . .
accomplish their daily goals with those [sic] number of breaks
if they'd be off task throughout the day," the VE responded
"yes."

**D.    The ALJ's Decision**

In his decision dated August 26, 2011, the ALJ followed the
five-step sequential evaluation process set forth in 20 C.F.R. §
404.1520(a)(4) to determine whether an individual is disabled.
At step one, the ALJ noted that there was evidence in the record
that Quimby had worked during the alleged disability period, but
he concluded that this work did not rise to the level of
substantial gainful activity.  At step two, he noted that Quimby
had the following severe impairments: left ankle fracture;
obesity; anxiety disorder; affective disorder; personality

disorder; and attention-deficit hyperactivity disorder. At step

three, the ALJ concluded that Quimby did not have an impairment

or combination of impairments that met or medically equaled one

of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1. The ALJ then found that Quimby retained the

Residual Functional Capacity ("RFC") to perform light work per

20 C.F.R. § 404.1567(b), subject to a number of specific

limitations which he described as follows:

> [Quimby] is unable to climb ladders, ropes or
> scaffolds, and is able to frequently crouch and
> occasionally crawl. She is able to use foot controls
> occasionally with her left foot. She is able to
> understand, remember and carry out 1-3 step tasks and
> may require[] written instructions until learned. She
> is able to maintain focus for 30-45 minutes at a time,
> with a 3-5 minute break. She is able to make simple,
> work-related decisions and adapt to routine work place
> changes. She should be isolated from the general
> public but is able to have superficial, occasional
> interactions with the public. She is able to be
> around co-workers, but she must usually be working by
> herself on her own [sic], and is able to interact with
> supervisors several times per day on a routine basis.
> She is unable to work in an environment of fast-paced
> production requirements.

The ALJ followed a two-step analysis in developing Quimby's

RFC. Tr. at 17. First, he considered whether she suffered from

any medically determinable impairment. He concluded that she

did, and that her impairments could reasonably be expected to

14

cause her alleged symptoms.  Second, he determined the extent to
which the intensity and persistence of Quimby's symptoms limited
her functioning.  The ALJ found Quimby's testimony regarding
"the intensity, persistence and limiting effects of [her]
symptoms . . . not credible to the extent [it was] inconsistent
with" his RFC determination.  Id.

        The ALJ provided several reasons for concluding that Quimby
was not credible.  With respect to Quimby's physical
impairments, he explained that Quimby had responded positively
to her ankle brace, and that even before she began using the
brace, clinical and radiological examination "show[ed] normal
alignment of the foot with some swelling, but no peripheral
edema or lymphedema and no ankle instability, muscle atrophy or
deficits in reflexes," "normal gait without overt antalgia," and
"only mild arthritic changes through the tibiotalar joint and no
problems with subtalar articulation."  Tr. at 18.  He also
highlighted the relative dearth of treatment records relating to
the ankle injury, the fact that Quimby "enjoys walking,"
"exercis[ed] for much of the period under review," failed to
allege "any limitations in her ability to perform activities due
to her ankle issues," and noted "that her ankle is not a reason

for her claim for disability." Id.  The ALJ determined that the
combination of Quimby's ankle impairment and obesity would not
preclude her from completing light work.

   With respect to Quimby's mental impairments, the ALJ noted
that "her medication appears to be helpful in alleviating her
symptoms" and recent records show "normal speech and affect,"
"few episodes of anxiety and stress," "relatively stable
symptoms," "improved mood, improved sleep, more energy and
motivation," and "no functional impairment as of April 2011."
The ALJ also noted that "[m]uch of her counseling focuses on
peer relationships[,] . . . boredom[,] and feeling unfulfilled,"
and that Quimby "had no difficulty with understanding,
concentrating, talking or answering during the [Social Security
intake] interview."  Further, "she is able to do household
chores, make meals, . . . attend to personal care without
assistance or reminders[,] . . . . routinely socialize with
others on the computer and spend[] time with her partner." Id.
The ALJ noted that Quimby's assessment of her own strengths
included "organizational skills, planning, ability to make
others laugh . . . [and to] logically look[] at problems," and
observed that her testimony regarding regularly working or

playing with dogs, receiving unemployment compensation, and going on job interviews was inconsistent with disabling impairments.  Tr. at 19.

The ALJ gave the "most weight" and "significant weight," respectively, to Dr. Strain's and Dr. Jenning's opinions given their "medical expertise, knowledge of the Social Security regulations and because [they have] had the opportunity to review [Quimby's] medical records."  Tr. at 19-20.  In addition, the ALJ concluded that their assessments were "generally consistent with the medical evidence of record . . . ."  Tr. at 20.

The ALJ gave "some weight" to Dr. Hong's and Dr. Boedecker's opinions "in light of [their] long term treatment of [Quimby] and [their] personal knowledge of [Quimby's] treatment history."  Tr. at 20-21.  He gave "limited weight" to Ms. Hollow's opinion "because it is inconsistent with the medical evidence of record, including [her] treatment notes."  Tr. at 21.  The ALJ discounted the opinions of all three treating providers to the extent that they reported marked limitations in understanding and memory, concentration and persistence, social interaction, and adaptation.  Tr. at 20-21.  The ALJ focused

17

instead on these providers' treatment notes indicating that
Quimby's symptoms had been alleviated by medication, that she
had been active, and that she was able to work with certain
modifications.  He noted that some of the treating providers'
opinions were conclusory and inconsistent with Quimby's own
reported functionality.  Id.

    After considering the evidence of record and developing an
RFC, the ALJ moved to step four of the sequential evaluation
process.  Here, the ALJ relied on the VE's testimony to
determine that Quimby's RFC precluded her from performing any of
her past relevant work, including past work as a chauffeur,
kennel attendant, private investigator, sales clerk, and food
preparation assistant.  Tr. at 21.

    Finally, at step five, the ALJ again relied on the VE's
testimony to determine that Quimby could successfully transition
to other work.  Tr. at 22.  After being instructed to consider a
hypothetical individual of Quimby's age, education, work
experience, and RFC, the VE testified that such an individual
could perform the duties of a housekeeper, mail clerk, and
photocopy clerk, all of which exist in significant numbers in
the regional and national economies.  Based on this testimony,

18

the ALJ concluded that Quimby was not disabled at any time on or
after her alleged disability onset date.  Id.

## II.  **STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), I must review the pleadings and
the administrative record and enter a judgment affirming,
modifying, or reversing the final decision of the Commissioner
denying DIB to Quimby.  My review "is limited to determining
whether the ALJ used the proper legal standards and found facts
[based] upon the proper quantum of evidence." Ward v. Comm'r of
Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The ALJ is responsible for determining issues of
credibility and for drawing inferences from evidence in the
record.  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955
F.2d 765, 769 (1st Cir. 1991) (per curiam) (citing Rodriguez v.
Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir.
1981)).  It is the role of the ALJ, not the court, to resolve
conflicts in the evidence.  Id.  The ALJ's findings of fact are
accorded deference as long as they are supported by substantial
evidence.  Id.  Substantial evidence to support factual findings
exists "if a reasonable mind, reviewing the evidence in the

19

record as a whole, could accept it as adequate to support his conclusion."  Id. (quoting Rodriguez, 647 F.2d at 222).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion."  Id. at 770 (citing Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam)).

Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam) (citing Irlanda Ortiz, 955 F.2d at 769; Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986) (per curiam)).

### III.  ANALYSIS

Quimby moves for reversal and remand on several grounds. She argues that the ALJ (1) failed to account for the effects of her OCD at step two of the sequential evaluation process; (2) improperly credited the opinion of a state agency physician, Dr. Strain, who made his physical RFC assessment based on an incomplete record; (3) gave insufficient weight to the opinions

of Quimby's treating sources relative to that of a state agency
psychologist, Dr. Jennings, in developing a mental RFC; and (4)
failed to address inconsistent VE testimony regarding Quimby's
ability to transition to other work.  I address each argument in
turn.

## A.  The ALJ Accounted for the Effects of Quimby's OCD

Quimby argues that the ALJ erred by ignoring the effects of
her diagnosed OCD at step two of the sequential evaluation
process.  I disagree.

The Social Security regulations include obsessive-
compulsive symptoms under the listing for "anxiety related
disorders."  See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.06
("[A]nxiety related] disorders [include] . . . resisting the
obsessions or compulsions in obsessive compulsive disorders. . .
. [and r]ecurrent obsessions or compulsions which are a source
of marked distress . . . .").  At step two, the ALJ found that
Quimby's anxiety disorder was a severe impairment.  He then
considered symptoms stemming from Quimby's obsessive compulsive
disorder at steps three and four in conjunction with her other
anxiety-related symptoms.  See Tr. at 48 (noting ALJ's question
to Quimby whether she has "any more generalized anxiety separate

from the OCD <u>which is an anxiety disorder</u>") (emphasis added);
Tr. at 67 (incorporating "some of the OCD type symptoms" in the
hypothetical that the ALJ posed to the VE).

Even assuming that the ALJ failed to consider Quimby's OCD
at step two, there would still be no error because the ALJ found
other severe impairments and continued to the next step of his
evaluation.  See <u>Hines v. Astrue</u>, No. 11-CV-184-PB, 2012 WL
1394396, at *12-13 (D.N.H. Mar. 26, 2012) (quoting <u>Heatly v.
Comm'r of Soc. Sec.</u>, 382 F. App'x 823, 824-25 (11th Cir. 2010))
("Nothing requires that the ALJ must identify, at step two, all
of the impairments that should be considered severe.  Instead,
at step three, the ALJ is required to demonstrate that it [sic]
has considered all of the claimant's impairments, whether severe
or not, in combination."), <u>rep. & rec. adopted</u> <u>sub nom.</u> <u>Hines v.
U.S. Soc. Sec. Comm'r</u>, No. 11-CV-184-PB, 2012 WL 1393063 (D.N.H.
Apr. 20, 2012).

For these reasons, Quimby's claim that the ALJ erred by
failing to consider her OCD at step two lacks merit.

**B.   Substantial Evidence Supports the ALJ's Physical RFC
     Assessment**

Quimby next argues that the ALJ gave excessive weight to
Dr. Strain's physical RFC assessment.  In particular, Quimby

22

posits that Dr. Strain, a non-examining state agency physician, relied on a "materially deficient record" when he failed to consider Quimby's hearing testimony and the notes from Dr. Gentchos's orthopedic consultation.  Again, I disagree.

Because a state agency physician's review of the evidence of record occurs at an earlier point in the process than a claimant's testimony before the ALJ, Dr. Strain could not possibly have reviewed Quimby's testimony and was under no obligation to do so.  See Parkes v. Astrue, No. 1:11-CV-99-NT, 2012 WL 113307, at *2 (D. Me. Jan. 11, 2012), rep. & rec. adopted sub nom. Parkes v. Comm'r, Soc. Sec. Admin., No. 1:11-CV-00099-NT, 2012 WL 642656 (D. Me. Feb. 27, 2012). Furthermore, although Dr. Strain's assessment of Quimby's records only mentioned Dr. Hong's treatment notes and failed to reference Dr. Gentchos's consultation or the ankle brace, the ALJ did consider this later evidence and reasonably concluded that it was consistent with Dr. Strain's assessment of Quimby's physical limitations.  See Tr. at 18.

A non-examining medical source's opinion that fails to account for all of the evidence of record may still serve as substantial evidence "where the medical evidence postdating the

23

reviewer's assessment does not establish any greater limitations or where the medical reports of claimant's treating providers are . . . not clearly inconsistent with[] the reviewer's assessment." Ferland v. Astrue, 2011 DNH 169, 11 (citation and internal quotation marks omitted).  Although the record indicates that Quimby experiences pain and swelling around her ankle, neither Dr. Hong nor Dr. Gentchos noted any specific functional limitations related to the ankle, see, e.g., Tr. at 339-41, and Quimby herself asserted that her ankle impairment was not a reason for her disability claim.  See Tr. at 185. Under these circumstances, any differences between Dr. Strain's assessment and the treatment notes of Dr. Hong and Dr. Gentchos are not so stark as to require remand for reconsideration of Quimby's physical RFC.[11]  Cf. Berrios Lopez v. Sec'y of Health &

---

[11] Quimby testified that she could only stand for about an hour before she had to rest and elevate her leg.  Tr. at 45.  The ALJ should have acknowledged this testimony - the only evidence in direct conflict with Dr. Strain's RFC assessment - and explicitly weighed it against all the information in Quimby's record.  See Bica v. Astrue, 2011 DNH 193, 17 ("[A]n ALJ may not ignore relevant evidence, particularly relevant evidence that supports the claimant's application.").  Nevertheless, given the ALJ's discussion of Quimby's work and personal activities, her receipt of unemployment compensation, and the relative lack of treatment notes regarding the ankle during the alleged period of disability, the oversight is not so significant as to require remand on this issue.  See Perez v. Sec'y of Health, Educ. &

Human Servs., 951 F.2d 427, 432 (1st Cir. 1991) (per curiam)
(affirming ALJ's determination that non-examining physician's
opinion constituted substantial evidence when his "disagreement
with the [treating] physicians' conclusions [wa]s not stark").

   "It is within the [ALJ's] domain to give greater weight to
the testimony and reports of [non-examining] medical experts."
Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275
(1st Cir. 1988).  Given the specific functional limitations
noted by Dr. Strain and the ALJ's assessment of Quimby's
credibility, I find that the ALJ's physical RFC assessment is
supported by substantial evidence.

**C.   Substantial Evidence Supports the Relative Weight Placed on
   Each Medical Opinion Concerning Quimby's Mental Impairments**

   Quimby argues that the ALJ provided insufficient
justification for his decision to place greater weight on Dr.
Jennings' opinion than on those of her three treating sources.
Again, I disagree.

   Generally, an ALJ should give greater weight to the opinion
of a claimant's treating source, less weight to the opinion of
an examining source, and the least weight to the opinion of a

Welfare, 622 F.2d 1, 3 (1st Cir. 1980); Tardiff v. Astrue, 2012
DNH 053, 26; Bica, 2011 DNH 193, 35 n.8.

non-examining source such as Dr. Jennings.  See 20 C.F.R. §
404.1527(c).  If the ALJ concludes that a treating source's
opinion "is well-supported by medically acceptable clinical and
laboratory diagnostic techniques and is not inconsistent with
the other substantial evidence in [the] case record," that
opinion must be given controlling weight.  Id.  Regardless of
whether a medical source is considered treating, examining, or
non-examining, however, the ALJ must assess certain factors
enumerated in the Social Security regulations and provide "good
reasons" for the weight given to any medical opinion deemed not
controlling.[12]  Sibley ex rel. Sibley v. Astrue, 2013 DNH 022, 16
& n.5 (citing Polanco-Quinones v. Astrue, 477 F. App'x 745, 746
(1st Cir. 2012)).

In this case, Dr. Jennings provided a brief overview of
Quimby's psychiatric history that noted fluctuation in the

---

[12] These factors are: the length of the treatment relationship
and frequency of examination; the nature and extent of the
relationship; the extent to which medical signs and laboratory
findings, and the physician's explanation of them, support the
opinion; the consistency of the opinion with the record as a
whole; whether the treating physician is a specialist in the
field; and any other factors that tend to support or contradict
the opinion.  20 C.F.R. § 404.1527(c)(2-6).

severity of Quimby's impairments over time.[13]   Tr. at 74-75.

Consistent with her review of the record, Dr. Jennings made

selections on a check-off form ranging from "not significantly

limited" to "moderately limited" with respect to Quimby's

understanding and memory, concentration and persistence, social

interaction, and adaptation.   Id. at 79-80.   Dr. Jennings

concluded that Quimby "would be limited to simple, unskilled,

non-stressful work."   Id. at 80.

The ALJ gave Dr. Jennings' opinion "significant weight" due

to her "medical expertise, knowledge of the Social Security

regulations[,] . . . because she had the opportunity to review

---

[13] Dr. Jennings' summary echoes the limitations discussed in the
treating sources' notes, while also making the following
findings in support of her ultimate conclusion that Quimby was
not disabled:

> She appears less anxious and seems to have developed
> better coping skills. . . . She does not have any
> homicidal/suicidal ideations. . . . There have been no
> hospitalizations due to mental health issues. . . .
> Her sleep and appetite are good at this time. . . .
> She carries on goal directed conversations without
> pressured speech or flight of ideas. . . . There is no
> evidence of paranoia, disordered thoughts, delusions
> or hallucinations. . . . She is of average
> intelligence and her recent and remote memory is
> intact. . . . Her insight and judgement [sic] are
> good.

Tr. at 74-75.

[Quimby's] medical records[, and because] . . . . her assessment
is generally consistent with the medical evidence of record . .
. ."  Id. at 19-20.  The ALJ additionally cited Quimby's
activities of daily living, her work history, and her receipt of
unemployment compensation in support of his decision to place
significant weight on Dr. Jennings' opinion.  Id. at 18-19.
This rationale, supported by evidence drawn from Quimby's
treatment notes and her own testimony, indicates sufficient
consideration of the factors specified in the regulations.  See
20 C.F.R. § 404.1527(c)(4), (6) (instructing an ALJ to consider
whether an opinion is "consistent . . . with the record as a
whole" as well as the medical source's "understanding of our
disability programs and their evidentiary requirements . . . and
the extent to which [he or she] is familiar with the other
information in your case record").

     In contrast, the ALJ was justified in determining that
Quimby's treating source opinions were inconsistent with other
substantial evidence of record, thereby declining to give those
opinions controlling weight.  See Shaw v. Sec'y of Health &
Human Servs., 25 F.3d 1037 (1st Cir. 1994) (unpublished table
decision); 20 C.F.R. § 404.1527(c)(2).  The ALJ gave "some

weight" to Dr. Hong's and Dr. Boedecker's opinions "in light of

[their] long term treatment of [Quimby] and [their] personal

knowledge of [Quimby's] treatment history," Tr. at 20-21, but he

discounted their conclusions to the extent that the treatment

notes reflected progress in Quimby's level of functionality.

See id. at 18-21.  In particular, he discounted Dr. Hong's

opinion because his "own treatment notes show that [Quimby's]

stress and anxiety has [sic] been alleviated by medication and

that she has been active," citing to three of Dr. Hong's

treatment notes in support of these findings.  Id. at 20.

Additionally, the ALJ discounted Dr. Boedecker's opinion because

"her own treatment notes do not reflect [a] marked level of

impairment," citing to an October 2009 note reflecting

"significantly reduced anxiety," four recent treatment notes

reflecting "few noted functional limitations," and repeated

statements that Quimby was capable of working with some

modifications.  Id. at 20-21.  Lastly, the ALJ discounted Ms.

Hollow's opinion because "it is inconsistent with the medical

evidence of record, including [her own] treatment notes . . . ."

Id. at 21.  The ALJ concluded that Quimby "does not have

persistent functional impairments," noting that she "has been

29

busy working out five times per week as well as working for a friend." Id.

Quimby is correct in noting that all three treating sources concluded that she suffers from marked impairments in several functional areas that effectively prevent her from working. Id. at 330-36. The treating sources' observations are certainly consistent with each other, but they are also dispositive findings that are reserved to the Commissioner and thus warrant "[no] special significance." See 20 C.F.R. § 404.1527(d). The ALJ was entitled to come to a contrary conclusion in light of the internal inconsistencies he found in the treatment notes, the inconsistencies he found in Quimby's testimony, and Dr. Jennings' contrary conclusions, which together constitute substantial evidence in support of the relative weight given to each medical opinion. See Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991) (per curiam).

I emphasize that there is also substantial evidence in the record supporting Quimby's allegations of disabling mental impairments, but it is the role of the ALJ, and not of this court, to weigh and resolve conflicts in the evidence. See Rodriguez, 647 F.2d at 222 (citing Richardson v. Perales, 402

U.S. 389, 399 (1971); Alvarado v. Weinberger, 511 F.2d 1046, 1049 (1st Cir. 1975) (per curiam)).  The record here "arguably could justify a different conclusion," see Rodriguez Pagan, 819 F.2d at 3 (citing Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)), but the ALJ's decision to give each medical opinion the weight he did was supported by substantial evidence.  There was no error.

**D.   <u>The ALJ Erred in Relying on Inconsistent VE Testimony</u>**

The ALJ based his step five determination on testimony from the VE that a person with Quimby's RFC could work as a housekeeper even though she needed to take three to five minute breaks every thirty to forty-five minutes throughout the work day.  Tr. at 22, 65-69.  Quimby challenges the ALJ's reliance on the VE's testimony by noting that the VE also testified on cross examination that a housekeeper typically is given only one fifteen minute break in the morning, a thirty minute lunch break, and a second fifteen minute break in the afternoon.  Doc. Nos. 9, 12; Tr. at 68.  According to Quimby, this testimony is inconsistent with the VE's ultimate opinion that she could work as a housekeeper because the ALJ determined that she needed more

total time on break than the one hour of total break time that a
housekeeper typically receives.

At the hearing, Quimby's attorney and the VE engaged in the
following exchange:

> [Attorney:]      [T]ypically  how   many   breaks   are
> housekeepers given?
>
> [VE:]   The standard typical break schedule would be a
> morning break, a lunch break, and an afternoon break.
>
> [Attorney:]   How long would those breaks normally be?
>
> [VE:]    Usually  the morning and afternoon break would
> be 15 minutes, and lunch would be, typically, one-half
> hour.
>
> [Attorney:]   And so any more breaks would need an
> accommodation generally?
>
> [VE:]   Yes.
>
> [Attorney:]   So then wouldn't it be inconsistent that
> the claimant would be able to take a three- to five-
> minute break every 30 to 45 minutes? . . . [W]e're
> talking over an hour break throughout the day, in
> addition to those normal breaks.   Wouldn't that
> preclude her from doing the housekeeper job?
>
> [VE:]     Since   the  individual  would  be  working
> essentially alone, setting their own pace, frankly,
> it's hard to say what the impact on production might
> be.   If it's a five-minute break where she was being
> non-productive but completed the tasks because she was
> able to work fast enough the rest of the time and
> complete the tasks, then I don't think that the work
> performance would be impaired.   So it's difficult to
> say.

[Attorney:]   Right.   But so essentially if they were
to work faster than the other times to compensate for
the need to take a break, then they could perform the
job, but without doing that they'd probably get behind
schedule?

[VE:]   Correct.

[Attorney:]   And would the same hold true with pretty
much any of these jobs, that they'd be unable to kind
of accomplish their daily goals with those number of
breaks if they'd be off task throughout the day?

[VE:]   That's the way things would add up, yes.

Tr. at 68-69.  Relying on this exchange, Quimby contends that

the ALJ could not credit the VE's testimony because her RFC as

determined by the ALJ is inconsistent with the VE's testimony

concerning the job requirements of a housekeeping position.

The Commissioner responds to this argument by asserting

that the VE's testimony on cross examination is not inconsistent

with his ultimate opinion testimony because, if Quimby needed a

five minute break every forty-five minutes, the total amount of

break time she would need during a work day would still be less

than the hour of break time per day that the VE testified a

housekeeper typically receives.  This argument fails for two

reasons.  First, it does not account for the fact that a

housekeeper in New Hampshire has a statutory right to a one-half

hour lunch break during the work day in addition to the more

frequent breaks Quimby needs to address her concentration impairment.  See N.H. Rev. Stat. Ann. § 275:30-a.  When time for a lunch break is included in the Commissioner's calculation, Quimby's total required break time would exceed the one hour of total break time limit that the VE testified to on cross examination.  Second, the Commissioner's argument assumes that Quimby needs breaks only every forty-five minutes whereas her RFC requires her to take breaks every thirty to forty-five minutes.  The Commissioner's argument simply disregards the bottom end of the range, which would result in far more than an hour of total break time if Quimby needed five-minute breaks every thirty minutes rather than every forty-five minutes.

The Commissioner also argues that the VE's testimony on cross examination is inconsequential because the VE also testified that the total break time Quimby needed would not disqualify her from performing work as a housekeeper as long as she were able to compensate for the additional break time by working at a faster pace than she would otherwise have to work if she took only the one hour of total break time.  This argument fails because it is based on an assumption concerning Quimby's work capacity that has no support in the record.  It is

34

the Commissioner's burden to prove that jobs exist in the national economy that Quimby would be capable of performing. See 20 C.F.R. § 404.1512(f).  Because there is no medical evidence in the record to support a finding that Quimby has the capacity to work at a faster than normal pace if she is given frequent breaks during the work day, I cannot credit the VE's testimony based on an assumption that she has such a work capacity.[14]

### IV.  CONCLUSION

For the foregoing reasons, I deny the Commissioner's motion to affirm (Doc. No. 10) and grant Quimby's motion to reverse or

---

[14] It is conceivable that the ALJ's specified break schedule could serve as a "reasonable accommodation" that would permit Quimby to "perform the essential functions" of the jobs discussed by the VE.  See 42 U.S.C. § 12111(8-9) (requiring employers subject to the Americans with Disabilities Act to provide reasonable accommodations to employees with disabilities).  But that inquiry falls outside the scope of the Social Security Act.  See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 803 (1999) (citing Memorandum from Daniel L. Skoler, Assoc. Comm'r for Hearings & Appeals, Soc. Sec. Admin., to Admin. Appeals Judges, reprinted in 2 Social Security Practice Guide, App. § 15C[9], pp. 15-401 to 15-402 (1998)) ("[W]hen the SSA determines whether an individual is disabled for SSDI purposes, it does not take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI.").

remand (Doc. No. 9).   Pursuant to sentence four of 42 U.S.C. §

405(g), I remand the case to the Social Security Administration

for further proceedings consistent with this decision.[15]

     SO ORDERED.


                    /s/Paul Barbadoro
                    Paul Barbadoro
                    United States District Judge

November 8, 2013

cc:   Francis M. Jackson, Esq.
     Karen B. Fitzmaurice, Esq.
     T. David Plourde, Esq.

---

[15] On remand, the ALJ should also consider Quimby's related argument that the periodic break schedule, in addition to the other non-exertional mental limitations included in Quimby's RFC, were not derived from any evidence of record and thus were the result of the ALJ's lay assessment of the medical evidence. Furthermore, I need not consider Quimby's contention that Dr. Gustavson's psychological assessment constitutes new material evidence that was not available at the first hearing.   On remand, the ALJ may consider any evidence deemed relevant to the disability determination.

36